UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
ROCHESTER DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Chapter 7 |
| JOYCE ELLEN BISHOP, | ) | |
| | ) | Case Number 16-20593 |
| Debtor. | ) | |
| | ) | |
| | ) | |
| WILLIAM K. HARRINGTON | ) | |
| United States Trustee for Region Two | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary Proceeding |
| | ) | Case Number 17-_____ |
| JASON RACKI, | ) | |
| UPRIGHT LAW, LLC, | ) | |
| LAW SOLUTIONS CHICAGO, LLC, | ) | |
| ALLEN CHERN LAW, | ) | |
| ALLEN CHERN, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**COMPLAINT**

William K. Harrington, United States Trustee for Region Two (the "United States

Trustee"), by counsel, files this complaint to: (i) cancel the debtor's retainer agreement with

Upright Law, LLC, and/or Law Solutions Chicago, LLC, and/or Allen Chern Law, and Jason

Racki; (ii) enjoin the debt relief agency defendants from committing future violations of 11

U.S.C. § 526; (iii) impose appropriate civil penalties against the debt relief agency defendants;

(iv) prohibit Jason Racki, Upright Law, LLC, Law Solutions Chicago, LLC, Allen Chern Law,

and Allen Chern, from practicing before this court whether directly or indirectly; (v) to order

damages and/or sanctions as may be warranted and (vi) take such other action as the Court deems necessary to deter such misconduct and similar schemes in the future.[1]

## I.  SUMMARY STATEMENT

This case exposes serious abuses of the bankruptcy process by a multijurisdictional internet law firm doing business as Upright Law.  Ms. Bishop became a victim of Upright's abusive practices when it failed to explain various documents executed by Ms. Bishop, including documents authorizing telemarketer calls as well as a power of attorney on Ms. Bishop's behalf; when it failed to fully explain what services were included in the quoted fee and what services were add-on fees; and again when it failed to advise Ms. Bishop of New York law regarding stale-debt and mortgage deficiencies and the fact that this law would most like render Ms. Bishop's bankruptcy filing unnecessary.

Upright operates through a series of "partnership agreements" with local "partner" attorneys who, upon information and belief, are responsible for almost everything with regard to the Petition, Schedules, and SOFA except for the collection of fees and disclosure of those fees, which is completed by Upright.  Upright purports to help a debtor self-select a chapter in which to file, quote the prospective debtor a fee, and gather basic information such as bank accounts, household size, income, and amount of debt.  Depending on the prospective debtor's financial situation, the payment of Upright's total fees can take several months.  Only after all fees are paid is the debtor's file "handed off" to the "local partner" attorney, at which point the attorney

---

[1] The United States Trustee reserves his right to supplement and or amend this pleading, seeking further relief should the discovery of new evidence or facts warrant.

prepares the majority of the documents filed with the Court. It appears that little or no thought is given to the legal ramifications in the interim.

In this case, the local partner attorney, Mr. Racki, and Upright failed to perform the basic due diligence required by an attorney of record. As a result, Ms. Bishop's schedules and other filed documents contained numerous material errors and omissions, including, but not limited to, the omission of a vehicle titled in Ms. Bishop's name, the wrong household size on the means test form, inaccurate amounts of monthly income received from work and social security throughout the filed documents; inaccurate disclosure of the total fees paid by Ms. Bishop, what services were excluded and when those fees were paid and who received them. As counsel for the debtor, Mr. Racki and Upright each bear responsibility for filing accurate and complete documents. Most critical, however, is that due to Upright's delay in referring Ms. Bishop to competent New York licensed counsel to discuss her scheduled foreclosure debt and whether bankruptcy relief was necessary in light of the age of her debt and New York State Law regarding debt resulting from a foreclosure, it is unclear if Ms. Bishop received adequate legal advice before filing.

## II.  JURISDICTION AND VENUE

1)      This adversary proceeding relates to the chapter 7 case of Joyce Ellen Bishop, case number 16-20593 (the "Bishop bankruptcy case"), pending in the United States Bankruptcy Court for the Western District of New York, Rochester Division.

2)      The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

Page 3

3) This complaint is brought pursuant to 11 U.S.C. §§ 105(a), 307, 329 and 526 - 528; Fed. R. Bankr. P. 2016 and 2017; and the court's inherent power.

4) Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5) This is a core proceeding pursuant to 28 U.S.C. § 157(b).

6) The United States Trustee has standing to file this motion under 11 U.S.C. § 307 and Federal Rule of Bankruptcy Procedure 2017.

### III. BACKGROUND

A. <u>The Parties</u>

*i. Mr. Racki*

7) Defendant Jason Racki is the debtor's counsel of record. <u>See</u> Petition (ECF No. 1). He represented on the petition that his firm name in this case is Allen Chern, operating out of 140A Metro Park, Rochester, New York. His ECF participant registration form and the docket in this case disclose his firm name as the Law Office of Jason Racki, 10314 Spook Woods Rd, Port Byron, New York.

8) Mr. Racki practices before this Court as a sole practitioner and also purports to be a partner in Upright Law LCC by virtue of a limited partnership agreement.

9) During the relevant period of time for this case, Racki also purported to be a partner of Voight Law or VL.

10) Mr. Racki is a "debt relief agency" as defined by 11 U.S.C. § 101(12A) and he provided bankruptcy assistance to Ms. Bishop.

Page 4

*ii. Upright Law, Law Solutions, Allen Chern and affiliates*

11)    Defendant Law Solutions Chicago LLC is an Illinois limited liability company that does business as Upright Law LLC ("Upright Law" or "Upright"). It filed articles of organization with the Illinois Secretary of State on October 10, 2008. It is authorized to transact business in Illinois under the following assumed names: Jason Allen Law, LLC; Upright Law, LLC; and Allen & Associates, LLC. On its website, Upright Law lists its headquarters at 79 West Monroe, 5th Floor, Chicago, IL 60603 and, at the time Ms. Bishop contacted it, it purported to have "Local Offices Nationwide." Upon information and belief, Upright Law has an office in Chicago and no local offices nationwide. It has an intake/call center at its Chicago office.

12)    Upright's connection to New York appears to be through services offered by "Allen Chern Law." Upright incorporated in the State of New York on January 16, 2014 and does business in the State of New York as "Allen Chern Law" but under the umbrella of the national name "Upright Law" and/or "Upright."

13)    Kevin Chern, an owner and manager of Upright, is an attorney licensed by the State of Illinois to practice law. Chern is not licensed to practice law in New York.

14)    Jason Royce Allen, an owner and manager of Upright, is an attorney licensed by the State of Illinois to practice law. Allen is not licensed to practice law in New York.

15)    According to Upright's website, Edmund Scanlan is the chief executive officer of "Upright Law," and a manager of an entity named Upright Litigation, LLC. According to Upright's website, "all legal services are provided by affiliated and related entities." The website

Page 5

states that Scanlan is the "CEO" or "Administrator" of every entity allegedly providing the legal services to prospective debtors.

16) On information and belief, when Ms. Bishop contacted Upright, it employed no lawyers licensed in the State of New York at its Chicago call center.

17) Moreover, Allen Chern Law does not have a have a "brick and mortar" location as required in New York.

18) Upright Law is a "debt relief agency" as defined by 11 U.S.C. § 101(12A) and it provided bankruptcy assistance to the debtor, Ms. Bishop.

### iii. Ms. Bishop

19) Ms. Bishop is the debtor in this case and is an "assisted person" as defined by 11 U.S.C. § 101(3) because she has primarily consumer debts and the value of her non-exempt property is less than $186,825. Moreover, Upright's website acknowledges its federal designation as a Debt Relief Agency.[2]

### iv. United States Trustee

20) Plaintiff United States Trustee is a Department of Justice official with standing to file this complaint under 11 U.S.C. § 307.

B. Upright's Business Model

21) Upright solicits both prospective debtor clients and local attorney "partners" over the Internet, using the website "www.uprightlaw.com." On its current website, it purports to

---

[2] On its website, Upright holds itself out as a "debt relief agency helping people file for bankruptcy under the bankruptcy code." See https://www.uprightlaw.com/terms-conditions (last visited April 4, 2017).

have "Local Attorneys Nationwide" and provides that "all legal services are provided by affiliated and related entities." The website goes on to provide: "By an Act of Congress and the President of the United States, UL/ACL is a federally designated Debt Relief Agency. Attorneys and/or law firms promoted through this website are also federally designated Debt Relief Agencies. They help people file for relief under the U.S. Bankruptcy Code." It also contains a link to "Disclosures required under the U.S. Bankruptcy Code." Finally, the website states that Edmund Scanlan is the "CEO" or "Administrator" of every entity allegedly providing the legal services to prospective debtors. On information and belief, Mr. Scanlan is not a licensed attorney.

### i. Solicitation of Debtor Clients

22) Upon information and belief, when a prospective debtor reviews the Upright Law website, he or she is asked to provide his or her contact information to learn if they qualify for bankruptcy relief. Thereafter, Upright agents -- located in Chicago – call the prospective debtor. These agents, known as "inside sales representatives," "closers," "first responders," or, at other times, "senior class consultants," are not attorneys. These non-lawyer agents conduct the initial interview, ask the prospective debtor questions about his or her financial situation, and determine if there is an apparent ability to pay for legal services and a desire to "make a life-changing decision" regarding his or her financial circumstances. If the answer is yes, these non-lawyers give the prospective debtor legal advice, including, but not limited to describing the differences between a chapter 7 and chapter 13 proceeding. After advising the prospective debtor of the

available options, the "closer" will ask the potential client to "self-select" what chapter is the best fit.

23) Following this "self-selection," the "closer" will gather basic intake information such as income, sources of income, household members, expenses and assets and enter this data into Upright's software. Based on this information, the non-lawyer consultant will advise the client whether or not to file bankruptcy and under which chapter, quote a fee to the prospective debtor client, and ask them if they wish to hire the firm.

24) Upon information and belief, if the prospective debtor agrees to hire Upright, the "closer" asks the prospective debtor to provide bank account information, which Upright can use to withdraw bankruptcy-related fees and costs. Generally, if the prospective debtor cannot pay the fee immediately, automatic withdrawals are set up to debit the prospective debtor's account over time.

25) Upon information and belief, after an opportunity for discovery, the evidence is expected to show that in 2015, Upright did not refer prospective debtors to a local "limited partner" licensed to practice law in the relevant local jurisdiction, such as New York, until the prospective debtors had paid Upright in full. During this process, the prospective debtor is told to contact Upright in Chicago for questions or concerns. Only after the fees are paid in full, which can take several months, depending on the installment plan, and the client's particular financial situation, is the client "handed off" to the local partner attorney to start collecting documents and preparing the actual petition and completing their due diligence.

26)     Representatives from Upright have recently testified before other courts that Upright no longer waits for the client to pay the entire fee, and now cases can be referred to a local partner as early as the day the client first makes a payment to Upright or shortly thereafter so that the partner attorney can set up a "compliance call" with the client.  On information and belief, the compliance call averages 15 minutes.  During that call or afterwards, the local partner attorney has the discretion to reject the client unilaterally, despite the prospective client not being given any reason to believe they are not represented.

*ii.  Engagement Letters*

27)     Upon information and belief, during this process, Upright electronically provides an engagement agreement to the client to sign via electronic signature.  <u>See</u> Exhibit 1.  Upon information and belief, Upright does not obtain wet signatures.

28)     Pursuant to a partnership agreement with their various local "partners," the local partner's signature is affixed to the retainer agreement as well as other documents without the local partner necessarily reviewing the document with the prospective client.  <u>See</u> Exhibit 2, a sample partnership agreement.

C.     <u>Timeline with Ms. Bishop</u>

*i.  The Internet Search and First Call with the "Closer"*

29)     In October of 2015, while contemplating filing a bankruptcy, Ms. Bishop searched the internet for a bankruptcy attorney to assist her with her worries about a possible foreclosure.  Ms. Bishop located Upright's website and made an online inquiry.  She then spoke to Upright's non-attorney agents over the phone.  Rule 2004 Examination at p. 29, lines 24-25;

and p. 30, lines 1-14.  <u>See</u> Exhibit 3.  She testified that she does not recall to whom she spoke but she believes the person was not a lawyer.  Id. at p. 32, lines 14-17.

30)     Ms. Bishop said this non-lawyer went over the different types of bankruptcy options, including chapters 7 and 13, discussed payment plans for Upright fees, and quoted her a price for filing a chapter 7.   Id. at p. 34, lines 7-25; p. 35, lines 1-24; and p. 38, lines 19-23.  This person also explained how she could make payments over time and stated that he would electronically send her documents to read, sign and return.  Id. at p. 35, lines 4-6 and 20-24; and p. 41, lines 6-9.  During that initial call, Ms. Bishop authorized a $5.00 payment to Upright.  Id. at p. 42, lines 10-20.  She believed she had hired Upright during that initial call.  Id. at p. 33, lines 16-18.  She was told that a local New York attorney would be contacted to represent her.

31)     An Upright internal Transaction Report provided by Mr. Racki, shows that Ms. Bishop authorized the initial $5.00 payment to Upright on October 19, 2015.   <u>See</u> Exhibit 4.

32)     Although the debtor had no contact with Mr. Racki on or before October 19, 2015, the Retainer Agreement purportedly was signed electronically by both the debtor and Mr. Racki on October 19, 2015.  <u>See</u> Exhibit 1.  Other documents bearing the debtor's and Mr. Racki's electronic signatures and also dated October 19, 2015 include:  Disclosures Regarding Auto-Dialed and Pre-Recording Telemarketing Messages (Exhibit 5); A Debt Relief Agency, Disclosures to an Assisted Person in Relation to a Bankruptcy Consultation (Exhibit 6); Important information about Bankruptcy Assistance Services from an Attorney or Bankruptcy Petition Preparer (Exhibit 7); Client Instructions Pursuant to 11 U.S.C. Section 342(b) (Exhibit 8); Acknowledgement of Receipts Rules for Filing Bankruptcy (Exhibit 9);  Client Instructions

Pursuant to 11 U.S.C. Section 527(c) (Exhibit 10 bearing the debtor's initials only) and

Automatic Payment Program Application and Authorization for Withdrawals (Exhibit 11,

bearing the debtor's initials only).   Although the acknowledgment attached as Exhibit 9 states

that an attorney had reviewed with the debtor the documents attached as Exhibits 6-8 and 10, the

evidence is expected to show that no attorney reviewed such documents with the debtor on or

before October 19, 2015.

*ii. Second Call*

33)     About a week after speaking with the first Upright representative, Ms. Bishop said

that she spoke by phone with a second Upright representative, who she believes identified herself

as Rachel.  Rule 2004 Examination at p. 41, lines 15-25; p. 42, lines 1-12; and p. 43, lines 10-21.

Ms. Bishop did not believe this person was a lawyer.  Id.  Like the initial call with the "closer",

during her call with Rachel, Ms. Bishop did not recall reviewing her mortgage foreclosure debt,

including the age of that debt, whether the bank took any action following the foreclosure, or the

effect New York law might have on that debt as a result of its age or as a result of the bank

taking no further action against her following the foreclosure.  Id. at p. 37, lines 17-25; p. 38,

lines 1-18; p. 43, lines 22-25; and p. 44, lines 10-15.  She also does not believe Rachel asked for

any documents during the call or discussed with her the fees, her payment plan or what services

were covered by the fee.  Id. at p. 44, lines 8-9 and 17-25; p. 47, lines 20-25; and p. 48, lines 1-

10.  Similarly, she does not recall Rachel or the initial representative saying she may be charged

an additional $100 or other fee if she wanted to meet in person with an attorney or if amended

schedules were needed, regardless of who was responsible for the error in schedules.  Id. at p. 44,

lines 22-25; and p. 45, lines 1-6. Likewise, Ms. Bishop testified that she did not recall anyone going over the Rules for Filing bankruptcy or Definitions during either of these two calls. Id. at p. 45, lines 16-25; and p. 46, lines 1-6.

34) While Ms. Bishop's signature is electronically affixed to various documents prepared by Upright and dated October 19, 2015, Ms. Bishop testified that she did not recall signing the documents the day she first spoke with the Upright "closer" and authorized the $5.00 payment to Upright. Id. at p. 46, lines 13-25; and p. 47, lines 1-9. She emphatically stated she never would have signed a document allowing telemarketers to call her. She does not recall anyone explaining the paperwork that authorized telemarketer calls, or that by signing the engagement letter, she gave Upright a power of attorney to file other lawsuits on her behalf, despite documents to the contrary. Transcript at p. 48, lines 11-25; and p. 49, lines 1-15; and Engagement letter in Exhibit 2 at ¶ 15.

### iii. Contact with Local "Partner" Mr. Racki

35) Ms. Bishop does not recall exactly when she first spoke with Mr. Racki or his assistant Tracy, but she knew it was some time after she spoke by phone with the two representatives from Upright in Chicago. Id. at p. 12, lines 14-21; p. 35, line 25; and p. 36, lines 1-19. Therefore, it is clear she did not speak with Mr. Racki on the date the agreement is purportedly signed by Ms. Bishop and Mr. Racki. She believed the point of the initial call with Mr. Racki was for him to verify he would handle the case. Id. at p. 54, lines 9-25; and p. 55, lines 1-4. She did not recall if he asked any questions or asked her to provide him with information during the initial call. She believes the call lasted about 15 minutes. Id. at p. 55,

lines 5-14. At no time during that initial call did anyone discuss with her New York mortgage deficiencies and the requirement that they must be pursued within 90 days in order for a mortgagor to be responsible for a deficiency. Id. at p. 28, lines 18-25; p. 29, lines 1-3; p. 36, lines 20-25; p. 37, lines 1-25, p. 38, lines 18; p. 39, lines 14-25; and p. 40, lines 1-14. She also did not recall if Mr. Racki ever discussed New York law and its treatment of stale dated debts. Id. at p. 56, lines 20-25; and p. 57, lines 1-15 and lines 23-25. Similarly, she did not recall any lawyer, including Mr. Racki, going over the details of her retainer agreement with her. Id. at p. 46, lines 13-25; p. 47, lines 1-25; and p. 48, lines 1-2.

36)     Ms. Bishop recalled someone from Upright explaining the various options in bankruptcy available to her. She believes when she met with Mr. Racki's assistant, Tracy, to go over the schedules, Tracy may have gone over the Rules for Filing Bankruptcy, Important Information about Bankruptcy Services, and Client Instructions at that time. Id. at p. 49, lines 16-25; and p. 50, lines 1-18. Tracy is not an attorney.

37)     Despite documents to the contrary, Ms. Bishop does not believe a lawyer ever reviewed with her a copy of the 1) Rules for Filing Bankruptcy; 2) Important Information about Bankruptcy Assistance Services; 3) Definitions and/or 4) the Retainer Agreement.

38)     Ms. Bishop stated she met with Mr. Racki in person when she went to sign the petition and schedules, recalling they agreed to meet in Watkins Glen in the bankruptcy courtroom at a time when Mr. Racki was going to be there. Id. at p. 11, lines 3-14. The court's calendar for May 2016 shows hearings conducted on Friday, May 20, 2016.

Page 13

39)     On May 24, 2016, Mr. Racki filed Ms. Bishop's voluntary petition, schedules etc., at ECF No. 1.  The filed documents state that Ms. Bishop signed the document on Tuesday, May 24, 2016, not Friday, May 20, 2016.

### iv.  The § 341 Meeting of Creditors

40)     Mike Arnold, Esquire, who was appointed to serve as the chapter 7 trustee in this case, conducted the Meeting of Creditors in June of 2016.  At this meeting, he questioned the debtor regarding, among other things, the fees charged in this case as they were higher than the presumed reasonable fee in the Western District of New York, about a car that was not disclosed on Schedule A/B.   Following that discussion, Mr. Racki agreed to refund $300 to Ms. Bishop.

41)     The chapter 7 trustee brought the case to the United States Trustee's attention as a result of the omissions and errors on the schedules, his concerns regarding the fees charged in this case, and the appearance that the fees paid to Upright were made by the debtor using her credit card over several months and not on "March 2016" as stated on the SOFA #16.

### v.  The Rule 2004 Examination of the Debtor

42)     After reviewing the information and the docket, the United States Trustee filed a motion to conduct a Rule 2004 Examination of the Debtor along with a request for the production of documents (ECF. No. 17), which was granted by this Court's oral ruling of September 30, 2016.  ECF No. 29.

43)     Three days prior to the Rule 2004 examination, the Debtor filed amended schedules to include the previously undisclosed automobile and to reflect that she paid $1,300 for legal fees in this case.

44)     The United States Trustee conducted the Rule 2004 examination of the Debtor on September 30, 2016.   At that meeting, the Debtor agreed to provide several additional documents to the United States Trustee because certain pages were missing from the documents produced prior to the 2004 examination.  Those documents were received on November 9, 2016.

### vi. United States Trustee Motion

45)     On January 6, 2017, the United States Trustee filed a motion [ECF No. 33], pursuant to 11 U.S.C. §§ 105(a); 329; 526-528; Fed R. Bankr. P. 2017 and the court's inherent authority to examine transactions and fees, seeking disgorgement of attorney fees, cancellation of any agreement for compensation, and imposing sanctions such as civil penalties and enjoining counsel from further violations (the "United States Trustee's motion"), with an original return date of February 2, 2017.

46)     On January 30, 2017, Steven A. Donato, Esq., and Camille W. Hill, Esq., entered Notices of Appearance as counsel for Allen Chern, Allen Chern Law, Law Solutions of Chicago, LLC and Upright Law LLC [ECF 41 and 42].

47)     On February 6, 2017, responses and objections were filed by Camille Hill, Esq., and Jason Racki, Esq., and a hearing was held on the United States Trustee's motion on February 16, 2017.

48)      Following oral argument, the Court granted the United States Trustee's request to disgorge all compensation, cancelled any agreement for further compensation and ruled that the request to review transactions and impose sanctions may be refiled as an adversary proceeding complaint.  The order was signed on April 4, 2017 [ECF No. 56].

D.    Documents Filed with the Court

  i. *Fees Disclosed vs. Fees Paid*

49)    The Disclosure of Compensation of Attorney for Debtor(s) filed in this case

("Rule 2016 Disclosure") and signed by Mr. Racki, stated he, Jason Racki of Allen Chern, 140A

Metro Park, Rochester, NY 14623, notices@Uprightlaw.com, Rackiesq@outlook.com, agreed to

accept $1,600 in this case and received $1,600 from the debtor.   See Exhibit 12.  The response

to question 16 in the original Statement of Financial Affairs for Individuals Filing for

Bankruptcy ("SOFA"), stated within one year before filing, the debtor paid "Allen Chern"

located at 79 W. Monroe St., 5th Floor, Chicago, IL  60603 a total of "$1,600.00" in "March

2016" for "Attorney Fees" and an additional "$335.00" for "Filing Fees" for a total amount of

payment of "$1,935.00."  Upon information and belief, this response was prepared by Upright

Law.

50)    Guidance on SOFA question 16 advises to include any fees paid to attorneys,

bankruptcy petition preparers or credit counseling agencies for services required in their

bankruptcy (emphasis added).  Id.  Ms. Bishop does not disclose any credit counseling fees in

her answer to SOFA question 16.

51)    As noted infra at ¶ 32, Mr. Arnold inquired about the fee, noting that it was above

the W.D.N.Y. "presumptively reasonable" fee in chapter 7 cases of  without any apparent

justification.  Following that discussion, Mr. Racki volunteered to refund $300.00 to the Debtor

as well as provide documentation to the trustee that the refund was made.

Page 16

52)     In the information provided to Mr. Arnold, it showed that Upright refunded $250.00 to Ms. Bishop on a Visa card on 6/27/16.  Mr. Racki also provided the trustee with a computer generated printout, showing that the Debtor paid Upright for her bankruptcy via credit card payments, and that the attorney fee refund appeared to have been made to her credit card. See Exhibit 4.

53)     No explanation for the different amount or method of refund was provided to Mr. Arnold.

54)     On September 30, 2016, Mr. Racki informed the undersigned that the information disclosed in his Rule 2016(b) statement and on the Debtor's Statement of Financial Affairs, question 16 was not correct – Ms. Bishop actually paid $1,550 in legal fees in this case not the $1,600 disclosed.  Id. at p. 67, lines 11 and 18-20.  Mr. Racki also stated that the payment was not made on March 2016 as disclosed on the SOFA but rather was made over time between October 19, 2015 and March of 2016.  Id. at p. 68, lines 9-22.   Finally, Mr. Bishop stated that she paid for credit counseling in connection with this case to an organization called Moneysharp. Id. at p. 69, lines 24-25; and p. 70, lines 1-19.

55)     Mr. Racki filed an amended Rule 2016(b) statement disclosing that a total of $1,300 was paid for services in this case; this amount reflected the $250.00 that was returned to the debtor following the chapter 7 trustee questioning the fees at the § 341 meeting of creditors ($1,550 - $250 = $1,300).

56)     Subsequent to the United States Trustee's motion for disgorgement filed on January 6, 2017, at ECF 33, Mr. Racki filed an amended SOFA on January 31, 2017, at ECF 43,

Case 2-17-02007-PRW    Doc 1    Filed 04/28/17    Entered 04/28/17 15:54:30    Desc Main
Document      Page 17 of 35

disclosing $1,300 paid for attorney's fees that still stated the date of the payment was March 2016 and failed to include the fee for credit counseling.

57) Another amendment to the SOFA filed on February 11, 2017, at ECF 50, finally discloses the range of dates payments had been made and included the credit counseling, but reflects an attorney fee of $1,550.

*ii. Retainer Agreement Does Not Match Disclosure of Compensation*

58) Not only does Mr. Racki's original Disclosure of Compensation (the Rule 2016(b) Statement) conflict with the actual amount paid for services and the dates of those payments but it also conflicts with the terms of the Engagement letter provided to Ms. Bishop. Specifically, Mr. Racki informed the Court that he had agreed to "render legal services for all aspects of the bankruptcy case, …" and that the only services that were excluded were in part 7, which provided "[b]y agreement with the debtor(s), the above-disclosed fee does not include the following services: (a) Representation of the debtors in any dischargeability actions, judicial lien avoidances, relief from stay actions or any other adversary proceeding." <u>See</u> Exhibit 12.

59) This relatively small number of exclusions appears to be in contrast with the Engagement Letter Upright sent to Ms. Bishop, which under the terms of paragraph 9 exclude from the "base legal services" the following 15 post-petition services:

(a) Discharge proceedings, including those related to student loans, taxes or undue hardships;

(b) Motions for relief from, or continuation, defense or enforcement of the Automatic Stay;

Page 18

(c)  Motions to redeem personal property;

(d)  Rule 2004 examinations (hourly);

(e)  Motions to avoid liens/judgments ($500.00);

(f)  Contested matters or adversary proceedings;

(g)  Contested matters regarding Client's claim of exempt property;

(h)  Filing any amendments to the schedules … (hourly);

(i)  Motions to continue the 341 meeting of creditors and/or appearing for a continued

341 hearing;

(j)  Motions or adversary complaints to abandon/refinance/sell/purchase property;

(k)  Assisting in carrying out the Debtor's Statement of Intentions (hourly);

(l)  Monitoring an "asset case" (hourly);

(m) Re-opening a bankruptcy case to submit post-filing proof of pre-discharge counseling

($355)

(n)  Issues that arise that are not specifically listed in the Retainer (hourly); . . . .

See Exhibit 1.  The Retainer Agreement also goes on to exclude from "base legal

services" reaffirmation agreements.  Id. at ¶10.  Moreover, the Agreement is internally

inconsistent in that the purported "included" services include amendments while the "excluded"

services list amendments.  This is a violation of 11 U.S.C. § 528 as it makes the Agreement

unclear as to what is included and what isn't.

60)     In addition, pursuant to the Retainer Agreement, Ms. Bishop is required to pay

administrative costs, defined as "postage, parking, copies, gas limited to a flat fee of $100,"  . . .

Page 19

and cost of amended schedules ($176.00). Id. at ¶7. These potential additional fees also are not set forth in Mr. Racki's disclosure to the Court.

61)     To ensure that the above costs are paid, Ms. Bishop signed a document authorizing Law Solutions Chicago, LLC, to charge her account ending in 8718 for any charges incurred pursuant to the Retainer Agreement, which would necessarily include charges for "non-base legal services" and costs noted above. See Exhibit 11, Automatic Payment Program Applications and Authorization for Withdrawals.

62)     In light of these provisions contained in the Retainer Agreement signed by Ms. Bishop, Mr. Racki's Disclosures of Compensation to this Court are false and misleading.

63)     The United States Trustee filed a motion to disgorge attorney's fees, among other things, in this case [ECF No. 33]. After concluding that the Rule 2016(b) Statement the Defendant filed with the original petition at ECF 1 when compared to the more recently filed Rule 2016(b) Statement at ECF 36 were so radically different, bearing no relationship to the retainer agreement signed by the debtor, as to be misleading and fatally infirm, on April 4, 2017, the Court ordered full disgorgement under 11 U.S.C. § 329 due to the failure to adequately disclose the sum and substance of the engagement contract and ordered that any agreement for further compensation is cancelled.

             iii.  *Other Errors/Omissions/Lack of Specificity in Ms. Bishop's Filed Documents*

64)     Ms. Bishop's schedules and other bankruptcy documents were incomplete, incorrect, vague and inaccurate in many other aspects such that Ms. Bishop could have faced dischargeability actions.

## *Missing Car from Schedule A/B*

65)      At the Meeting of Creditors, the chapter 7 trustee identified several deficiencies, including but not limited to, the omission of a second automobile on Ms. Bishop's Schedule A/B. Specifically, Schedule A/B listed one vehicle, a 2004 Ford Explorer, but failed to disclose the debtor's ownership of a 2002 Buick LeSabre titled in her name. [ECF No. 1]

66)      Upon questioning at the meeting, Ms. Bishop disclosed her ownership of the LaSabre, which she testified is her granddaughter's car and in her name for insurance purposes. An amended Schedule A/B was filed months after her § 341 meeting of creditors [ECF No. 20] to add the LaSabre but it incorrectly listed the owner as Ms. Bishop's daughter, not her granddaughter.  Upon questioning by the undersigned, Ms. Bishop testified it was her granddaughter's car, not her daughter's, and that she did not know why the amended schedule incorrectly states that it is her daughter's.  Id. at p. 16, lines 15-25; p. 17, lines 1-25; p. 18, lines 1-25; p. 19, lines 1-20.  To date, no amended Schedule A/B has been filed to correct the error.

## *Household Size is Incorrect*

67)      On questioning at the § 341 meeting of creditors, the trustee learned Ms. Bishop's adult daughter lives with the Debtor, and had been at the time of filing.  Official Form 122A-1, commonly referred to as the Means Test form, however, discloses that Ms. Bishop is a household of 1.  Ms. Bishop's counsel did not file an amended form to reflect her true household size until just days before her Rule 2004 examination.  [ECF No. 23]

## *Income Disclosed on Schedule I and Means Test is not Accurate*

a.      Income from Bethany Nursing Home

68)     Schedule I lists monthly gross wages of $746.10 for debtor's work as an LPN at Bethany Nursing Home & HRF.

69)     This would appear to be greatly understated based on the fact that the Means Test lists monthly gross wages of $1,270.63.

70)      This understatement of income is further supported by the Statement of Financial Affairs, which lists annual income from wages of $23,570 for 2015, which equates to $1,964 per month.

71)     On her "Currently Monthly Income Details for the Debtor" Ms. Bishop disclosed that her actual income from Bethany Nursing Home for the month of January 2016 was $851.60.

72)     The debtor's earning statement, dated February 4, 2016 (for the period ending January 30, 2016), however, shows year to date earnings of $1,568, which time period would only include the month of January 2016.

73)     When questioned at the Rule 2004 examination about the difference, Ms. Bishop stated that she did not know why her income for January is listed at such a low amount. Id. at p. 24, lines 10-20.

74)     A review of the Debtor's pay stubs shows that Ms. Bishop's wages fluctuate based on the number of hours and different shifts she works.  Because of this, in order to correctly determine CMI for the Means Test, one needs to review all pay advices for the six month CMI period.  Through discovery, the United States Trustee requested pay advices for the time period in question.  Several pay advices were missing, specifically, December 20, 2015

through January 16, 2016 and February 1, 2016 through February 13, 2016 (issued, respectively, in January 2016 and on February 18, 2016.)

75) Even with the missing pay advices, certain months are able to be ascertained. For instance, as noted supra, the pay stub for the period ending January 30, 2016 shows the year to date income as $1,568.67 not the amount $851.60 listed.[3]

b. Social Security Income

76) Schedule I lists that the debtor receives Social Security income of $774.00 per month.

77) On her "Current Monthly Income Details for the Debtor" the debtor disclosed that her actual non-estimated non-CMI income from Social Security was $834 each month. Specifically, she listed the following.

78) Through discovery, Ms. Bishop produced her Benefit & Payment Details from the Social Security Administration for the time period November 2014 through March of 2016. This document revealed that the Debtor's benefits fluctuated during the CMI period ranging from a low of $729.00 to a high of $834.00. See Exhibit 15. When asked why the document stated that she received $834 each and every month when her actual payments varied, Ms. Bishop said that she did not know. Rule 2004 Examination Transcript at p. 26, lines 11-25; and p. 27, lines 1-8.

---

[3] The one payment advice for January 2016 that was received shows gross pay as $717.07. See Exhibit 13. Similarly, payment advices for March show two checks -- one with a gross pay of $262.48 and the other for $586.55 (see Exhibit 14), for a total gross earnings of $849.03 -- not the $1,528.43 disclosed by the Debtor supra.

79)     These differences carry over to the Statement of Financial Affairs where the debtor listed that in 2015 her SSI Benefits totaled $5,794.00 while the debtor's statement from https://secure.ssa.gov shows that her benefits in 2015 totaled $6,565.00.

80)     The substantiating documents provided by Ms. Bishop demonstrate that the information listed on the Schedules and Statement of Financial Affairs with regard to her income is not accurate.

81)     No amendments have been filed following the Rule 2004 examination to reflect the actual amounts received or expected to be received on a going forward basis.

*Schedules Lack Required Specificity*

82)     A review of Ms. Bishop's Schedule A/B, Part 3 reveals that it lacks the specificity necessary to inform parties in interest of what is owned by the debtor without further questioning.  For example, in response to Question 6, which asks a debtor to describe their household goods and furnishings, Ms. Bishop lists "[v]arious used household goods and furnishings."  Similarly in response to Question 7, which asks the debtor to describe any electronics owned at the time of filing, with more than a dozen examples provided above the response, Ms. Bishop only lists "[v]arious used household electronics."

83)     It also is unclear from a review of the docket, petition and schedules in Ms. Bishop's case what law firm actually represents the Debtor and where it is located.  Specifically, the docket shows Mr. Racki operates from the Law Office of Jason Racki, located at 10314 Spook Woods Rd, Port Byron, NY 13140.  The petition, however, shows he operates out of the law firm Allen Chern, located at 140A Metro Park, Rochester, NY 14623.  And a mailing

Page 24

received in the U.S. Trustee's Office shows a third address for Mr. Racki at P O Box 310,

Brutus, NY 13166.

      E.      <u>Mr. Racki Knew or Should Have Known that Information was not Accurate</u>

84)      Mr. Racki, knew or should have known that not all the information contained in the Schedules and SOFA was accurate and/or complete.

85)      By way of example and not limitation, the income provided on the Means Test for CMI does not reflect the actual benefits and earnings received by Ms. Bishop. Even assuming these were numbers incorrectly listed by his assistant, Mr. Racki should have known after even a cursory review that there was a problem as the numbers were significantly inconsistent with the actual amounts. Moreover, Schedule J reflects that the Debtor, who has very modest expenses, is operating at a loss of more than $400 per month. This should have raised concerns and led to a more detailed examination of the debtor's income or extra expenses, which in turn most likely would have led to discussion about Ms. Bishop's daughter living with her. Further inquiry would have eliminated the household issue and revealed the fluctuating income. Similarly, if a title search had been completed and reviewed, the undisclosed automobile would have been noted. Further, a review of the firm's legal fee payment schedule would have shown that the SOFA inaccurately indicated that the Debtor paid funds to "Upright Law, LLC" in one payment in March 2016 vs. over multiple months spanning both 2015 and 2016; that the amount disclosed is not what the debtor paid or was quoted as a fee in her Retainer Agreement; and that the credit counseling fee was not included. A review of the Rule 2016(b) statement would have shown the obvious contrasts to the Engagement Letter.

Page 25

*i. Mr. Racki Failed to Comply with Local Rule*

86)      At the time of the § 341 meeting of creditors was held on June 24, 2016, the

trustee had not yet been served with the required documents (petition, schedules, tax returns,

deeds, titles, valuations, etc.) despite local requirements that counsel are to provide them seven

days in advance of the meeting. The disregard for the Local Rule negatively impacted the

administration of the case because without these documents, particularly the tax returns, deeds

and titles, the chapter 7 trustee could not timely complete his due diligence and examination of

the debtor, requiring the trustee to review documents after the fact, in what the trustee later

described as a case that should have been a routine no asset case.

*ii. Upright and Mr. Racki Failed to Provide Legal Advice on New York Law*
*Prior to Filing*

87)      On information and belief, at the time Ms. Bishop filed for bankruptcy relief and

when she first contacted Upright in October of 2015, Upright did not have a licensed New York

attorney in their Chicago call center.

88)      Indeed, it would appear that no New York licensed attorney advised Ms. Bishop

on bankruptcy alternatives best suited to benefit her based on the type and age of her unsecured

debt before she completed her payments and met with Mr. Racki or his New York assistant.

89)      At no point prior to hiring Upright and or during the months of paying installment

fees did Upright advise Ms. Bishop on New York law and how it affected her potential filing –

either with regard to how mortgage deficiencies work or how stale dated debt is treated under

New York law. Rule 2004 Testimony at p. 28, lines 18-25; p. 29, lines 1-3; p. 36, lines 20-25; p.

Page 26

37, lines 1-25; p. 38, lines 1-18; p. 39, lines 14-25; p. 40, lines 1-14; p. 43, lines 22-25; p. 44, lines 10-15; p. 56, lines 20-25; and p. 57, lines 1-15 and lines 23-25.

90)     Similarly, when she met with Mr. Racki, he appears to have failed to explain how New York law affected her specific debt and whether bankruptcy was needed to discharge the foreclosure deficiency debt.  Id.

91)     This is critical because in this case, Schedule E/F lists a creditor, Tammac Holdings Corp, for "Real Estate Specific – Deed in Lieu" in the amount of $93,811.  The entry provides that this real property debt results from a foreclosure in 2010.  However, according to Ms. Bishop's testimony at the Rule 2004 examination, no deficiency judgment was pursued by the bank within 90 days.  As a result, there was no debt owed by Ms. Bishop to Tammac Holdings.  See In Re Tyler, 166 B.R. 21, 26 (Bankr. W.D.N.Y. 1994) (because "motion was not made within the required ninety-day period pursuant to RPAPL § 1371(3) the foreclosure sale proceeds were taken in full satisfaction  . . . and no right to recover any deficiency in any action or proceeding exists. State law determines the validity and legality of claims. In re Calton Crescent, Inc., 173 F.2d 944, 946 (2d Cir. 1949), aff'd 338 U.S. 304, 70 S. Ct. 127, 94 L. Ed. 107 (1949).")  Moreover, because that debt would be 6 years old in just 90 days, it would be rendered stale dated and unenforceable.  See e.g., In re Hess, 404 B.R. 747, 749 (Bankr. S.D.N.Y. 2009) (objection to proof of claims is sustained where claim is time barred under New York 6-year statute of limitation; In Re Brill, 318 B.R. 49, (Bankr. S.D.N.Y. 2004) (claim disallowed under § 502(b)(1) where New York 6-year state of limitations in C.P.L.R. § 213 had expired); and In re Jones, 2016 WL 1265716 (Bankr. W.D.N.Y. 2016) (claims barred by the state statute of

limitations could be disallowed under § 502(b)(1) unless the debtor's conduct revived or tolled the claim.)

92) Ms. Bishop stated that she was not facing an eviction, garnishment, etc. … but when she contacted Upright in 2015, she was exploring bankruptcy relief in 2015 because she was thinking about the foreclosure debt. Id. at p. 28, lines 18-25; and p. 29, lines 1-3. The remainder of her general unsecured debt totals only $12,845.19. Schedule E/F [ECF Doc No. 1].

93) Based upon the foregoing, the Defendants have acted in bad faith.


COUNT I – INJUNCTION 11 U.S.C. § 526(c)(5)(A) – NATIONWIDE OFFICES

94) The allegations set forth above are incorporated by reference.

95) The Bankruptcy Code provides that:

> Notwithstanding any other provisions of Federal law and in addition to any other remedy provided under Federal or State law, if the court, on its own motion or on the motion of the United States trustee or the debtor, finds that a person intentionally violated this section, or engaged in a clear and consistent pattern or practice of violating this section, the court may—
>
> (A) Enjoin the violation of such section; or
>
> (B) Impose an appropriate civil penalty against such person.

11 U.S.C. § 526(c)(5).

96) Upright and its affiliates have intentionally and/or systematically violated 11 U.S.C. § 526(a)(3)(A) by, among other things, misrepresenting to prospective debtors that it is a firm with nationwide offices and is able to represent them in, for example, cases filed in New York.

Page 28

97) Section 526 prohibits a debt relief agency from making a statement in a document filed in a bankruptcy case that is untrue or misleading. If the Court determines that a debt relief agency intentionally violated § 526 or engaged in a clear and consistent pattern or practice of violating § 526, the Court may enjoin the debt relief agency from further violations of the section, or impose a civil penalty. 11 U.S.C. § 526(c)(5)(A)-(B).

98) Pursuant to 11 U.S.C. § 526(c)(5)(A), Upright and its affiliates should be enjoined from violating 11 U.S.C. § 526.

COUNT II – INJUNCTION 11 U.S.C. § 526(c)(5)(A) – COMPENSATION DISCLOSURE

99) The allegations set forth above are incorporated by reference.

100) The Bankruptcy Code provides that:

Notwithstanding any other provisions of Federal law and in addition to any other remedy provided under Federal or State law, if the court, on its own motion or on the motion of the United States trustee or the debtor, finds that a person intentionally violated this section, or engaged in a clear and consistent pattern or practice of violating this section, the court may—

(C) Enjoin the violation of such section; or

(D) Impose an appropriate civil penalty against such person.

11 U.S.C. § 526(c)(5).

101) Upright and its affiliates have intentionally and/or systematically violated 11 U.S.C. § 526(a)(3)(A) by, among other things, filing a Disclosure of Compensation that contains statements that are untrue and misleading, and which Mr. Racki knew or should have known were untrue or misleading. In addition to intentionally filing the misleading statements, after an

Page 29

opportunity for discovery, the evidence is expected to show that in Ms. Bishop's case, Mr. Racki and or Upright have engaged in a clear and consistent pattern of filing false and misleading disclosures of compensation in the other Upright Cases. Mr. Racki's and Upright's conduct is therefore subject to sanction under either prong of § 526(c)(5).

102)    Section 526 prohibits a debt relief agency from making a statement in a document filed in a bankruptcy case that is untrue or misleading. If the Court determines that a debt relief agency intentionally violated § 526 or engaged in a clear and consistent pattern or practice of violating § 526, the Court may enjoin the debt relief agency from further violations of the section, or impose a civil penalty. 11 U.S.C. § 526(c)(5)(A)-(B).

103)    Pursuant to 11 U.S.C. § 526(c)(5)(A), Upright and its affiliates should be enjoined from violating 11 U.S.C. § 526.


## COUNT III – CIVIL PENALTIES UNDER 11 U.S.C. § 526(c)(5)(B)

104)    The allegations set forth above are incorporated by reference.

*Poor Quality of Schedules and Other Filed Pleadings are a Basis for Sanctions.*

105)    Rule 2017(a) provides: "on motion by any party in interest or on the court's own initiative, the court after notice and a hearing may determine whether any payment of money or any transfer of property by the debtor, made directly or indirectly and in contemplation of the filing of a petition under the Code . . . to an attorney for services rendered or to be rendered is excessive." Fed. R. Bankr. P. 2017(a).

Page 30

106)     Here, Mr. Racki and Upright Law knew or should have known that certain

information in documents filed with the Court  was inaccurate and yet they intentionally advised

the Debtor to sign declarations under penalty of perjury affirming the accuracy of the

information in the documents.   As a result, cause exists to impose sanction sanctions.

*Alternatively, the Retainer is Excessive.*

107)     Alternatively, the Court may order sanctions because the Retainer is excessive

compared to the narrow scope of representation defined by the Retainer Agreement.

108)     Here, Ms. Bishop paid Upright Law and Mr. Racki $1,550 for preparation of her

bankruptcy schedules, attendance at the meeting of creditors, and to file the certificate of credit

counseling. Under the terms of the Retainer Agreement, Mr. Racki is required to provide no

other services to the Debtor—unless she pays him an additional fee.  In light of the limited legal

services covered by the Retainer, the Retainer is excessive, and the fee returned to Ms. Bishop is

not sufficient to correct the problem.

109)     Moreover, the retainer paid by Ms. Bishop is excessive considering Mr. Racki's

and Upright's failure to provide the Debtor with competent legal representation and the multiple

errors noted in the Schedules and Forms.  Notably, Ms. Bishop was required to "self-select" the

appropriate relief she needed under the Bankruptcy Code (chapter 7 vs. Chapter 13) and counsel

for Upright, when she finally spoke with an attorney, failed to adequately advise her of her non-

bankruptcy options, which should have included a discussion of the operation of New York law

with regard to her real property that went into foreclosure in 2010.  This is not adequate or

diligent legal representation.

110)     Additionally, Mr. Racki failed to prepare adequate and complete documents for filing, and/or to timely correct those inadequacies by filing amended schedules.

111)     The United States Trustee also has serious concerns regarding whether Mr. Racki obtained the debtor's informed consent prior to aggressively limiting the scope of his legal representation in her bankruptcy case. See *In re Seare*, 493 B.R. 158, 202 (Bankr. D. Nev. 2013) ("For matters as complex as bankruptcy, a signed retainer agreement that merely states that certain proceedings are excluded from the flat fee is unlikely to suffice. . . . There must be a demonstrated link between the excluded services and the client's understanding of the import of excluding those particular services in relation to the client's particular circumstance").

112)     Given the limited scope of services covered by the Retainer; the quality of the legal representation provided by Mr. Racki and Upright in the Debtor's case; and the multiple errors in the schedules and forms, and the failure to properly counsel Debtor regarding the nature of her debts and relevant New York Law, cause exists for sanctions.

113)     The United States Trustee requests the Court impose sanctions upon Racki, Upright and its affiliates for the following reasons:

a)     Failure to accurately disclose the debtor's income, fees paid, and time of fees paid on the Statement of Financial Affairs (the "SOFA")
b)     Failure to accurately disclose the debtor's monthly income on Official Form 122A-1;
c)     Failure to accurately disclose the fees paid by the Debtor and all of excluded services on the Rule 2016(b) Statement;
d)     Failure to complete the Schedules accurately and completely;
e)     Failure to comply with the Debt Relief Agency provisions of Sections 526-528;
f)     Failure to provide adequate legal advice as to the need for filing, in light of the age of the debtor's debt, the failure of the bank to obtain a timely judgement, etc.;

Case 2-17-02007-PRW    Doc 1    Filed 04/28/17    Entered 04/28/17 15:54:30    Desc Main
Document      Page 32 of 35

g)     Facilitating the Unauthorized Practice of Law by having non-attorneys set fees and "advise" the debtor on bankruptcy chapter options and go over the retainer agreement and other required disclosures; and

h)     Directing and permitting non-New York admitted lawyers to advise clients who live in the state of New York on legal options and rights

114)    The United States Trustee recommends that the Court order a civil penalty sufficient to deter the abusive practice. <u>See</u>, e.g., *United States v. Gulf Park Water Co.*, 14 F.Supp.2d 854, 858 (S.D.Miss.1998) (surveying methodology used by courts in assessing amount of discretionary civil penalties under environmental laws and concluding that civil penalty must be high enough so that party cannot write off penalty as an acceptable trade-off for doing business).

115)    Cause exists to impose civil penalties under 11 U.S.C. § 526(c)(5)(B) against the Defendants in an amount not less than $5,000 each.


<u>COUNT IV – 11 U.S.C. § 105 AND INHERENT POWER</u>

116)    The allegations set forth are incorporated by reference.

117)    Section 105(a) authorizes the court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code and permits the court to "tak[e] any action or mak[e] any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." 11 U.S.C. § 105(a).

118)    In addition, federal courts have inherent power to regulate the conduct of attorneys and parties that appear before them. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991). <u>See</u> also *In re Hull v. Celanese Corporation*, 513 F.2d 568, 571 (2d Cir. 1975) (holding

the district court bears responsibility for supervision of the members of its bar); *In re Chase*, 372 B.R. 142, 153-54 (quoting Sakon v. Andreo, 119 F.3d 109, 113 (2d Cir. 1997); *Rosario v. St. Luke's Hospital Center (In re Goldstein)*, 430 F.3d 106, 110-11 (2d Cir. 2005) (the court has broad discretion in deciding what sanctions should be imposed)). *Wharton v. Calderon*, 127 F.3d 1201 (9th Cir. 1997) (holding that federal courts have inherent authority to regulate conduct of attorneys).

119)     This Court may use section 105(a) and/or its inherent power to require Upright to award damages, as appropriate, and any further relief as the Court deems necessary to deter such misconduct and abuse from ever occurring in the future.

120)     Cause exists for the court to use its inherent power and the authority granted to it under 11 U.S.C. § 105(a) to prohibit the Defendants from practicing before this court whether directly or indirectly through any companies in which they have any ownership interests or management authority.  Cause also exists to sanction them monetarily.

121)     The United States Trustee reserves the right to amend or supplement this pleading.

WHEREFORE, the United States Trustee, by counsel, requests that the court (i) cancel the debtor's retainer agreement with Upright Law, LLC, and/or Law Solutions Chicago, LLC, and/or Allen Chern Law, and Jason Racki; (ii) enjoin the debt relief agency defendants from committing future violations of 11 U.S.C. § 526; (iii) impose appropriate civil penalties against the debt relief agency defendants; (iv) prohibit Jason Racki, Upright Law, LLC, Law Solutions Chicago, LLC, Allen Chern Law, and Allen Chern, from practicing before this court whether

directly or indirectly; (v) to order damages and/or sanctions as may be warranted and (vi) take

such other action as the Court deems necessary to deter such misconduct and similar schemes in

the future.

<div style="margin-left: 45%;">

Respectfully submitted,
William K. Harrington

</div>

Dated: April 28, 2017       By:    */s/Kathleen D. Schmitt*
                                         Kathleen Dunivin Schmitt
                                         Assistant U.S. Trustee
                                         100 State Street, Room 6090
                                         Rochester NY 14614
                                         (585) 263-5812